UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JASON MILLS,

                 Plaintiff,                                  Hon. Ellen S. Carmody

v.

                                                  Case No. 1:11-cv-1341

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.

_____/

## OPINION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. On April 5, 2012, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment. (Dkt. #9).

        Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## <u>STANDARD OF REVIEW</u>

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 34 years old on his alleged disability onset date. (Tr. 242). He successfully completed high school and worked previously as a brick layer and material handler. (Tr. 26, 260, 270-74). Plaintiff applied for benefits on July 27, 2006, alleging that he had been disabled since May 24, 2006, due to injuries sustained in a motorcycle accident. (Tr. 242-51, 255). Plaintiff's applications were denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 159-241).

On March 18, 2009, Plaintiff appeared before ALJ Paul Jones, with testimony being offered by Plaintiff and a vocational expert. (Tr. 75-138). In a written decision dated April 3, 2009, the ALJ determined that Plaintiff was not disabled. (Tr. 143-53). The Appeals Council reversed the ALJ's decision and remanded the matter for further consideration of certain medical opinions. (Tr. 154-57). On May 17, 2010, ALJ Jones conducted a second hearing at which Plaintiff and vocational expert, Michelle Ross, testified. (Tr. 36-74). In a written decision dated June 22, 2010, the ALJ again determined that Plaintiff was not disabled. (Tr. 18-27). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-6). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2009. (Tr. 20). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that he became disabled prior to the expiration of his insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL HISTORY

On May 24, 2006, Plaintiff crashed his motorcycle into a tree suffering the following injuries: (1) left hip fracture; (2) fracture/dislocation of the right big toe; (3) fracture of the right tibia and fibula; (4) bilateral sacral fractures; (5) bilateral rami fractures;[1] (6) right pilon fracture;[2] and (7) multiple fractures of the right foot. (Tr. 335-439). Plaintiff underwent multiple surgical procedures performed by Dr. Terrence Endres. (Tr. 335-432). The damage to Plaintiff's right big toe could not be repaired, however, and the toe was subsequently amputated. (Tr. 404-05).

X-rays of Plaintiff's cervical spine, taken on May 26, 2006, revealed the following:

> Vertebral body height and alignment are maintained on the extension view. No fracture, subluxation or sign of dynamic instability is seen with flexion and extension...no prevertebral soft tissue swelling is seen.

(Tr. 357).

X-rays of Plaintiff's pelvis, taken the following day, revealed the following:

> Patient is again status post placement of bilateral fixation screws of the SI joints. The fractures of the sacral ala are in anatomic

---

[1] The pubic rami "are four areas in the front of the pelvis." *See* Pubic Rami Fractures, available at http://anterior-hip-surgery.com/pelvic/pubic-rami-fractures/ (last visited on March 9, 2013).

[2] Pilon fractures "affect the bottom of the shinbone (tibia) at the ankle joint." *See* Pilon Fractures, available at http://orthoinfo.aaos.org/topic.cfm?topic=A00527 (last visited on March 9, 2013). In "most cases, both bones in the lower leg, the tibia and fibula, are broken near the ankle" and in "many pilon fractures, the bones of the ankle joint are crushed due to the high-energy impact causing the injury." *Id.*

alignment. There is an intermedullary fixation rod in the left femur.
There is a nondisplaced fracture of the right acetabulum and superior
and inferior pubic rami on the right.

(Tr. 356).

X-rays of Plaintiff's right tibia and fibula, taken on June 9, 2006, revealed the

following: (1) a fracture of distal diaphysis study with comminuted fracture fragment; (2) fixation

with intramedullary rod; (3) no angulation displacement at the fracture site; (4) there is a segmental

fracture of the mid tibia present, no significant deformities present, a rod is present through the

fibula; and (5) comparison with prior study of May 24, 2006, demonstrates no significant change.

(Tr. 357).

X-rays of Plaintiff's left hip and femur, taken the same day, revealed

"intertrochanteric fracture of the left hip [with] improved alignment and apposition and operative

fixation." (Tr. 348). X-rays of Plaintiff's pelvis, also taken the same day, revealed the following:

(1) screws bridge both sacroiliac joints which are normal in their width; no diastasis demonstrated;

(2) symphysis pubis also appears intact; (3) no other definite pelvic fracture; (4) hips appear normal;

(5) the sacrum is grossly normal; and (6) intramedullary rod is noted in the left femur. (Tr. 355).

A CT scan of Plaintiff's right ankle and foot, also performed on June 9, 2006,

revealed the following: (1) comminuted distal tibial plafond fracture; (2) comminuted distal fibular

shaft fracture; (3) a rod with interlocking screws is present in the distal tibia as well as a nail

extending through the fibula across the fracture site; (4) intact talus and the ankle mortis appears

well aligned; and (5) extensive comminuted fracture of the calcaneus. (Tr. 418).

X-rays of Plaintiff's pelvis and hip, taken on June 22, 2006, revealed the following:

An intramedullary rod with compression screw is present, transfixing
a proximal left femoral fracture. There is mild distraction of the

greater trochanter of the femur, and there is exuberant callus formation at the fracture site. Long lag screws are present transfixing both sacroiliac joints, and there is no evidence of residual sacroiliac diastasis. A healing fracture of the right inferior public ramus is nondisplaced.

(Tr. 352).

On June 28, 2006, Plaintiff met with Dr. Endres. (Tr. 394-95). The results of an examination revealed the following:

AP and lateral [x-rays], left femur, were obtained and reviewed. There is an ITST nail in position, with the femur fracture well-maintained. Inlet and outlet pelvis views reveal the rami fracture to be stable. There are bilateral iliosacral screws in satisfactory position. The top of the ITST nail is noted. AP and lateral [x-rays] right tib/fib films reveal the tibial shaft and fibular fractures to be anatomically reduced and in excellent position. There are medial malleolar plates and screws across the tibial pilon which are stable. The foot is visualized and overall fracture alignment and position appear to be doing satisfactory. Lateral and axial [x-rays] of the calcaneus are reviewed. There is a medial T-plate and single axial screw in position. The calcaneus tuberosity is in excellent position.

(Tr. 394). The doctor instructed Plaintiff to continue with physical therapy, but to remain non-weight bearing on his lower extremities. (Tr. 394).

On August 17, 2006, Plaintiff participated in a CT scan of his lumbar spine the results of which revealed: (1) old fracture deformities have been fixed in the sacral wings; (2) disc protrusion right of the midline at L5-S1; and (3) a prominent bulge of the disc annulus at L4-5. (Tr. 439).

On September 13, 2006, Plaintiff was examined by Dr. Endres. (Tr. 441). An examination revealed the following:

Jason is improving and has been doing some [weight bearing]. His greatest complaint is with regard to his right foot and ankle area. This is the area of most of his pain which is sharp at times and achy

in nature. He has some swelling associated with this which is alleviated with rest and elevation. It is ongoing but appears to be improving slightly...He has completed his court evaluations and appears to be coping reasonably well with his substance abuse issues. Two views of the left femur...were ordered, obtained and reviewed and show an itst nail in position. The proximal femur fracture shows some shortening along the intertroch and femoral neck area but abundant bridging callous and healing. Three views of the right ankle...were ordered, obtained and reviewed. The calcaneus, hardware and pilon fixation are stable. The distal tip of the tibial nail is noted. Overall fracture alignment and position appear stable and healing. No hardware loosening or migration. Two views of the right tibia...were ordered, obtained and reviewed and show im tibial nail locked proximally and distally. The fracture appears to be bridging and showing signs of healing. Two views of the pelvis...were ordered, obtained and reviewed and show bilateral sacral screws in position. Pelvic alignment and position is excellent with no loss of fixation or migration.

(Tr. 441).

On May 16, 2007, Irwin Greenbaum, Ph.D., authored a letter regarding his treatment of Plaintiff. (Tr. 471). The doctor reported that he met with Plaintiff on four occasions between December 2, 2006, and January 13, 2007. (Tr. 471). The doctor reported that "from a psychological perspective the limitations produced by [Plaintiff's motorcycle] accident appear to have exacerbated depressive symptoms that first appeared following the loss of his job as a mason in November of 2004." (Tr. 471). The doctor further noted that Plaintiff's "current symptoms are consistent with the diagnostic impression of a major depressive disorder, single episode, mild." (Tr. 471).

On June 13, 2007, Plaintiff was examined by Dr. Endres. (Tr. 516). Plaintiff reported that "he is doing quite well" and "he is able to attempt some right masonry work with a friend just to test things and see how he is doing." (Tr. 516). The doctor reported that "overall he is making great progress and feeling stronger." (Tr. 516).

On August 1, 2007, Plaintiff was examined by Dr. Endres. (Tr. 515). Plaintiff

reported that "he is doing some masonry type work for a friend of his, and yesterday was the first day he was able to work and he worked six hours...[without] sequelae or residual symptoms." (Tr. 515). The results of an examination were unremarkable and Plaintiff exhibited "excellent" ankle range of motion. (Tr. 515).

On July 7, 2008, Dr. Chris Noah completed a report regarding Plaintiff's ability to perform work-related physical activities. (Tr. 466-69). The doctor reported that "during an 8-hour workday with normal break periods," Plaintiff could sit for two hours, stand for two hours, sit/stand for two hours, and walk for 30 minutes. (Tr. 466). The doctor reported that Plaintiff can frequently lift/carry 20 pounds and can occasionally lift/carry up to 50 pounds. (Tr. 466). The doctor reported that Plaintiff can frequently perform simple grasping, fine manipulation, and pushing/pulling activities with both of his upper extremities. (Tr. 467). The doctor reported that Plaintiff can occasionally bend, twist, and reach above shoulder level, but can never squat, kneel, crouch, crawl, stoop, or climb stairs or ladders. (Tr. 467).

On July 16, 2008, Plaintiff was examined by Dr. Endres. (Tr. 513-14). Plaintiff reported that he "had obtained a job working with a friend doing masonry-type work," but that he was now experiencing "pain in his foot and ankle that has affected his ability to continue to work." (Tr. 513). Plaintiff reported that he "is somewhat discouraged now, realizing that this likely will have some long term implications on his ability to perform heavy labor-type work or being on his feet for extended periods of time." (Tr. 513). The doctor observed that Plaintiff exhibited "a bit of a pes planus[3] stance." (Tr. 513). The doctor also reported that Plaintiff was suffering from

---

[3] Pes planus, or flat feet, refers to "a change in foot shape in which the foot does not have a normal arch when standing." *See* Flat Feet, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002242/ (last visited on March 5, 2013). Flat feet occur when "the tissues holding the joints in the foot together" become "loose." *Id.*

metatarsalgia[4] and several "claw toes."[5]  (Tr. 513).

On August 19, 2008, Dr. Greenbaum authored a second letter regarding his treatment of Plaintiff.  (Tr. 472).  The doctor reported that he met with Plaintiff on two occasions in August 2008.  (Tr. 472).  The doctor reported that the results of these sessions were "suggestive of continued significant depression and warrant no change in his major depression diagnosis."  (Tr. 472).  The doctor further noted that "a secondary diagnosis of PTSD is now warranted in light of his psychological response to the motorcycle accident."  (Tr. 472).  The doctor concluded that Plaintiff "appears to be physically and emotionally unable to maintain gainful employment at this point or in the foreseeable future."  (Tr. 472).

On March 13, 2009, Plaintiff met with Dr. Greenbaum.  (Tr. 530).  Plaintiff reported that he was feeling "increasingly anxious and overwhelmed."  (Tr. 530).  The doctor observed that Plaintiff "remained quite depressed, with significant sleep impairment and a foreboding sense of pessimism regarding his future."  (Tr. 530).  The doctor concluded that Plaintiff's "current symptoms are consistent with previous diagnostic impressions of major depressive disorder, single episode, mild; posttraumatic stress disorder; and panic disorder [without] agoraphobia."  (Tr. 530).  The doctor reported Plaintiff's GAF score as 45.[6]  (Tr. 530).

Treatment notes dated March 19, 2009, indicate that Plaintiff is walking "without a limp" and that "everything is looking good."  (Tr. 646).

---

[4]  Metatarsalgia is a condition "marked by pain and inflammation in the ball of [the] foot."  *See* Metatarsalgia, available at http://www.mayoclinic.com/health/metatarsalgia/DS00496 (last visited on March 5, 2013).

[5]  Claw toe refers to a condition in which the "toes 'claw,' digging down into the soles of your shoes and creating painful calluses." *See* Claw Toe, available at http://orthoinfo.aaos.org/topic.cfm?topic=a00156 (last visited on March 5, 2013).

[6]  The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A score of 45 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning."  DSM-IV at 34.

On April 20, 2009, Dr. Noah completed a report regarding Plaintiff's physical limitations. (Tr. 666-67). The doctor reported that during an 8-hour workday, Plaintiff can stand and/or walk less than two hours and can sit for less than six hours. (Tr. 667). The doctor reported that Plaintiff can frequently lift 10 pounds and can occasionally lift 20 to 50 pounds. (Tr. 667). The doctor reported that Plaintiff can perform simply grasping, reaching, pushing/pulling and fine manipulation activities with both upper extremities. (Tr. 667).

On April 30, 2009, Plaintiff was examined by Dr. Noah. (Tr. 659-60). Plaintiff reported that he was experiencing low back pain which radiates into his right lower extremity. (Tr. 659). A musculoskeletal examination revealed the following:

> Gait and station examination reveals mid[-]position without abnormalities. Inspection and palpation of bones, joints, and muscles is unremarkable. Bilateral foot dorsiflexors, bilateral foot plantar flexors, bilateral hip flexors, bilateral quadriceps, bilateral hip adductors and bilateral hip abductors muscle strength is 5/5. Muscle tone is normal. Lumbar ROM shows decreased flexion with pain, decrease extension with pain, decreased LLF with pain, decreased RLF with pain, decreased LR with pain, decreased RR with pain. He has 3/5 Waddell's signs.[7] Straight-leg raising test is normal bilaterally.

(Tr. 659). Plaintiff was instructed to participate in physical therapy. (Tr. 656).

On May 20, 2009, Plaintiff participated in an EMG examination the results of which revealed "electrodiagnostic evidence of an L5 radiculopathy on the right," but "no evidence of nerve entrapment syndrome or peripheral polyneuropathy." (Tr. 661-62). On August 10, 2009, Plaintiff reported that he obtained "minimal improvement" from physical therapy. (Tr. 654). On October

---

[7]  A positive Waddell's sign indicates that there exists a non-organic (i.e., psychological or psychosocial) component to an individual's lower back pain. *See, e.g., A New Sign of Inappropriate Lower Back Pain*, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2504150/ (last visited on March 5, 2013); *Assessment and Management of Acute Low Back Pain*, available at http://www.aafp.org/afp/991115ap/2299.html (last visited on March 5, 2013); Gordon Waddell, M.D., *Waddell's Signs - Do they Mean Malingering?*, Disability Medicine, March-June 2004 at 38-39; Steven Greer, M.D. and Leslie Mackler, *What Physical Exam Techniques are Useful to Detect Malingering*, The Journal of Family Practice, August 2005 at 719-22.

9, 2009, Plaintiff received an injection to treat his back pain after which his back and leg pain were "improved."  (Tr. 652-63).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[8]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.  While the burden of proof shifts

---

[8]1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.   If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

  The ALJ determined that Plaintiff suffers from "residuals of multiple fractures," a severe impairment that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 20-22). With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work[9] subject to the following limitations: (1) he can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs; and (2) he can occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 22).

  The ALJ concluded that Plaintiff was unable to perform any of his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly,

---

  [9] Sedentary work involves lifting "no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567. Furthermore, while sedentary work "is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.*

ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Michelle Ross.

The vocational expert testified that there existed approximately 13,200 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 67-68). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

A.   The ALJ's Conclusion that Plaintiff does not Suffer from a Severe Emotional Impairment is not Supported by Substantial Evidence and the Resulting RFC Determination Likewise is not Supported by Substantial Evidence

At step two of the sequential evaluation process, the ALJ must determine whether a claimant suffers from a "severe" impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). This step constitutes a "*de minimis* hurdle intended to screen out totally groundless claims." *Nejat v. Commissioner of Social Security*, 359 Fed. Appx. 574, 576 (6th Cir., Dec. 22, 2009) (citations omitted); *see also*, *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir., Feb. 22, 2008) (same). Accordingly, if an impairment imposes "more than a minimal effect" on the claimant's ability to perform "basic work activities," the ALJ must find the impairment in question "severe." *Nejat*, 359 Fed. Appx. at 576-77; *Anthony*, 266 Fed. Appx. at 457.

As discussed above, the record contains evidence that Plaintiff experienced

depression and post-traumatic stress disorder following his motorcycle accident. Dr. Greenbaum concluded that Plaintiff suffered from serious emotional limitations that prevented him from maintaining gainful employment. The ALJ, however, concluded that Plaintiff's "alleged mental impairments. . .do not impose significant limitations on his ability to work and are not severe within the meaning of the applicable regulations." (Tr. 21). This conclusion is not supported by substantial evidence. Dr. Greenbaum treated Plaintiff over a lengthy period of time and concluded that Plaintiff's emotional impairments had more than a "minimal" impact on Plaintiff's ability to perform basic work activities. In support of his conclusion, the ALJ relies on the results of a form completed by an individual, William Schirado, Ph.D., who never even examined Plaintiff. (Tr. 21, 444-57). The ALJ also places great reliance on Dr. Schirado's observation that Plaintiff was intoxicated at the time of his motorcycle accident. (Tr. 21, 456). The Court fails to discern the relevance of Plaintiff's blood alcohol content at the time of his motorcycle accident on the issue of whether he subsequently suffered from an emotional impairment that limits his ability to perform basic work activities.

The Court recognizes that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the ALJ considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir., Feb. 22, 2008) (citing *Maziarz*, 837 F.2d at 244); *Fisk v. Astrue*, 253 Fed. Appx. 580, 583-84 (6th Cir., Nov. 9, 2007) (same). Here, the ALJ did find that Plaintiff suffered from a severe impairment at step two and proceeded through the remaining steps of the analysis. Thus, while the ALJ's

finding that Plaintiff's alleged mental impairments are not severe is not supported by substantial evidence, such is not the basis for remanding this matter for further factual findings. Instead, it is the ALJ's faulty RFC determination, informed by his unsupported assessment of the evidence, that justifies remand.

With respect to his RFC determination, the ALJ recognized that Plaintiff suffers from significant physical limitations as evidenced by his conclusion that Plaintiff can perform only a limited range of sedentary work. However, despite the evidence detailed above, the ALJ did not recognize or identify any non-exertional limitations regarding Plaintiff's ability to perform basic work activities. This conclusion, and thus the ALJ's RFC determination, is not supported by substantial evidence.

The vocational expert testified that given Plaintiff's RFC, there existed a significant number of jobs which Plaintiff could perform despite such limitations. However, the ALJ's RFC determination is not supported by substantial evidence. Because the vocational expert's testimony was premised upon a faulty RFC determination, the ALJ's reliance thereon does not constitute substantial evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of his disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision is not supported by substantial

evidence, there does not exist *compelling* evidence that Plaintiff is disabled. Evaluation of Plaintiff's claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance. The Court concludes, therefore, that the Commissioner's decision be reversed and this matter remanded for further factual findings.

B.      The ALJ's Assessment of Dr. Noah's Opinion is not Supported by Substantial Evidence

As previously noted, on July 7, 2008, Dr. Noah completed a report regarding Plaintiff's ability to perform work-related physical activities. The doctor reported that "during an 8-hour workday with normal break periods," Plaintiff could sit for two hours, stand for two hours, sit/stand for two hours, and walk for 30 minutes. The doctor reported that Plaintiff can frequently lift/carry 20 pounds and can occasionally lift/carry up to 50 pounds. The doctor reported that Plaintiff can frequently perform simple grasping, fine manipulation, and pushing/pulling activities with both of his upper extremities. The doctor reported that Plaintiff can occasionally bend, twist, and reach above shoulder level, but can never squat, kneel, crouch, crawl, stoop, or climb stairs or ladders. The ALJ afforded "little weight" to Dr. Noah's opinion. (Tr. 25). Plaintiff asserts that because Dr. Noah was his treating physician, the ALJ was obligated to accord controlling weight to his opinion.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not

inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

The ALJ discredited Dr. Noah's opinion on the ground that it "is significantly

inconsistent with the evidence of record as a whole." (Tr, 25). Considering that the ALJ's RFC determination is very similar to, and in certain respects more restrictive than, Dr. Noah's opinion, the Court finds the ALJ's statement quite puzzling. The only areas in which Dr. Noah found Plaintiff more limited than the ALJ, concern Plaintiff's ability to kneel, crouch, crawl, and stoop. The ALJ found that Plaintiff could perform these activities "occasionally," whereas Dr. Noah found that Plaintiff was precluded from such activities.[10]

In support of his decision to discredit Dr. Noah's opinion, the ALJ relied on the results of a July 16, 2008 examination by Dr. Endres. (Tr. 513-14). As noted above, Plaintiff reported to Dr. Endres that he was experiencing right foot pain which prevented him from working. The doctor also observed that Plaintiff was suffering from flat feet and metatarsalgia as well as several "claw toes." The Court does not find the results of this particular examination "significantly inconsistent" with Dr. Noah's conclusion that Plaintiff is unable to kneel, crouch, crawl, and stoop. The ALJ also cited to the contents of an April 2009 report completed by Dr. Noah regarding Plaintiff's limitations. (Tr. 666-67). There is nothing in this report, however, that is inconsistent with the doctor's previous examinations or conclusions. In sum, the rationale articulated by the ALJ in support of his decision to discredit Dr. Noah's July 2008 opinion is not supported by substantial evidence.

C.     The ALJ's Assessment of Dr. Greenbaum's Opinion is Not Supported by Substantial Evidence

---

[10] With respect to Plaintiff's ability to sit, stand, and walk during the workday, it is not clear whether (or to what extent) the ALJ and Dr. Noah disagree. Dr. Noah reported that during an 8-hour workday, Plaintiff could sit for two hours, stand for two hours, sit/stand for two hours, and walk for 30 minutes. The ALJ, on the other hand, did not articulate any precise limitations in these particular areas, but instead simply concluded that Plaintiff could perform sedentary work which, as previously noted, "involves sitting" as well as a "a certain amount of walking and standing."

As noted above, following a March 13, 2009 examination, Dr. Greenbaum reported that Plaintiff "remained quite depressed, with significant sleep impairment and a foreboding sense of pessimism regarding his future." The doctor concluded that Plaintiff's "current symptoms are consistent with previous diagnostic impressions of major depressive disorder, single episode, mild; posttraumatic stress disorder; and panic disorder [without] agoraphobia." The doctor also concluded that Plaintiff was experiencing "serious" symptoms or a "serious" impairment in functioning. The ALJ, however, afforded "little weight" to Dr. Greenbaum's observations. Plaintiff argues that because Dr. Greenbaum was his treating physician, the ALJ was obligated to accord controlling weight to his opinion.

While Dr. Greenbaum did not articulate any specific functional limitations from which Plaintiff allegedly suffered, the doctor clearly concluded that Plaintiff suffered from severe emotional impairments that significantly limited his ability to function. As previously discussed, the ALJ's RFC does not incorporate any non-exertional limitations on Plaintiff's ability to function. This is in direct contrast to Dr. Greenbaum's opinion.

The ALJ offered three reasons for discrediting Dr. Greenbaum's opinion, none of which survive scrutiny. The ALJ first observed that Plaintiff's "psychological reaction to his life-altering accident was considered a typical reaction to physical trauma and not necessarily an independent psychological event." (Tr. 21). This observation by the ALJ appears to be a reference to Dr. Endres' opinion, following a June 28, 2006 examination, that "some of [Plaintiff's] emotions appear to be within the normal adjustment period for this type of injury and accident." (Tr. 394). Dr. Endres is a surgeon, not a mental health professional. Thus, his vague opinion concerning Plaintiff's "emotions" in the weeks immediately following his motorcycle accident should have

garnered little (if any) weight. Moreover, that Plaintiff's emotional response to his accident may have been "normal" does not necessarily mean that such did not result in significant non-exertional limitations.

The ALJ next concluded that Dr. Greenbaum's opinion was entitled to little weight because Plaintiff "has not sought continuing mental health care." (Tr. 21). Such is contradicted by the fact that Plaintiff treated with Dr. Greenbaum from December 2006, through March 2009. Finally, the ALJ noted that "the most recent evidence shows [Plaintiff] presents with no distress, is oriented, displays a normal mood and affect, and maintains good self-care." (Tr. 21). In support of this, the ALJ relied on treatment notes authored by doctors and physician's assistants with the Hastings Orthopedic Clinic. (Tr. 21, 652-65). As Plaintiff was almost certainly not seeking mental health care from an orthopedic clinic, the observations in question, vague and unspecific, are an insufficient basis on which to reject the opinions of Plaintiff's treating mental health provider. In sum, the rationale articulated by the ALJ in support of his decision to discredit Dr. Greenbaum's March 2009 opinion is not supported by substantial evidence.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. The Court further finds that there does not exist compelling evidence that Plaintiff is disabled. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**. A judgment consistent with this opinion will enter.

Date: March 12, 2013

    /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge